UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA C. SIMMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:11CV188 TIA |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3)for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.  The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On November 15, 2007, Plaintiff protectively filed an application for Disability Insurance Benefits ("DIB").  (Tr. 10, 53-56)  She filed an application for Social Security Income ("SSI") on December 6, 2007.  (Tr. 726-28)  In her applications, Plaintiff alleges disability beginning December 30, 2006 due to TI stroke, lupus, tumor on back of eye, high blood pressure, high cholesterol, and asthma.  (Tr. 45, 53, 726)  Plaintiff's applications were denied on April 7, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 22, 44-49, 720-25)  On September 4, 2008, Plaintiff appeared and testified at a hearing.  (Tr. 747-73)  In a decision dated February 24, 2009, the ALJ determined that Plaintiff had not been under a disability from December 30, 2006 through the date of the decision.  (Tr. 10-21)  The Appeals Council denied Plaintiff's

Request for Review on December 21, 2010.  (Tr. 2-4)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Upon questioning by the ALJ, Plaintiff testified that she was born on February 19, 1966.  She was single and had three children, ages 21, 23, and 18.  She lived with her two sons, Elwood and Xavier.  Plaintiff stated that she had a driver's license, but her son drove her to the hearing.  She completed the Eleventh grade and had a CNA license.  Plaintiff last worked in December of 2005.  (Tr. 751-54)

Plaintiff's attorney also questioned her about her alleged impairments.  Plaintiff testified that her treating physicians were Drs. Miller and Ali.  She was being treated for a stroke, lupus, and pain.  Plaintiff stated that she had a stroke in December 2005.  Dr. Miller treated Plaintiff's pain, while Dr. Ali treated her lupus, shoulder, and hip.  With regard to her shoulder, Plaintiff stated that they could not determine the problem but that Dr. Ali gave Plaintiff shots in her shoulder.  Plaintiff also testified to experiencing pain in her hip, as well as pain in her feet and knees.  Plaintiff took pain medications prescribed by her physician.  The medication helped alleviate the pain in her shoulder a little, but the three shots Plaintiff received did not work.  Plaintiff stated that the shoulder pain was located on her right side.  (Tr. 755-57)

Plaintiff also testified that she used a cane, which a physical therapist gave to her after her stroke.  She used it most of the time, including walking from her bedroom to the kitchen.  Plaintiff previously stopped using her cane but then needed it to keep from falling.  She testified that she was unable to stand in one place and hold something in each hand. She could sometimes walk without her cane from her house to the end of the driveway, but she normally kept the cane in her hand for safety.

Plaintiff opined that she could walk for about an hour before needing to rest. She could sit for about 30 minutes before she needed to change positions. Plaintiff explained that a bone in her leg would get numb and make her leg numb. To relieve the feeling of numbness, Plaintiff would stand for a little while, then sit back down. (Tr. 757-59)

During a normal day, Plaintiff sat for about 3 hours. She testified that she took 3 naps a day. Plaintiff also stated that she was able to lift a milk carton with her left hand but not a 10-pound bag of potatoes. She was unable to lift anything with her right hand, and she carried her purse over her shoulder. Plaintiff held her cane with her fingers and could not carry anything heavier than the cane. She attributed her lifting limitations to a lack of strength in her hand. In addition, if she tried to hold something between her right elbow and her body, the item would slide out. If Plaintiff walked somewhere with her purse and her cane, she would hold the cane in her left hand and place the purse strap over her right shoulder. With regard to Plaintiff's medications, she testified that they made her sleepy and caused difficulty with concentration and focus. She explained that she sometimes needed verbal statements repeated to her. (Tr. 760-62)

Plaintiff further testified that her son, Xavier, did the cooking. Plaintiff did not do laundry, dishes, vacuuming, sweeping, mopping, or bed-making. She sometimes went to the grocery store, but her two sons accompanied her. Plaintiff walked up and down the aisles with her cane and pushed the cart. Sometimes she took groceries off the shelves and put them in the cart. However, her sons had to reach down to the bottom shelf or up to the top shelf to retrieve items located there. In addition, her sons unloaded the groceries. Plaintiff's only hobby was watching TV. She gave up going out with friends and socialized very little. She attended church twice a month and never traveled out of state. Plaintiff reported no history of illegal drug or alcohol abuse, and she stated that

3

she took her medications as prescribed. (Tr. 763-66)

Upon questioning by the ALJ, Plaintiff testified that during the day she watched TV and talked on the phone for a couple hours. She watched TV all day except when she was sleeping. Plaintiff testified that she watched TV about 4 hours a day and slept the rest of the day, other than when she was up eating. In addition, Plaintiff continued to smoke about a pack of cigarettes a day. Finally, Plaintiff stated that she had been experiencing problems with her shoulder for about six months. (Tr. 766-67)

Steven Dolan, a vocational expert ("VE") also testified at the hearing. Mr. Dolan first questioned Plaintiff's past relevant work history, which included working for Atlantic Express, placing children's wheelchairs on a bus. Plaintiff stated that the work was part-time, totaling about 34 or 36 hours a week. The job lasted for about a year. Based on a review of Plaintiff's work history, the VE testified that Plaintiff's past relevant work was either skilled or unskilled and at the medium level. However, her job as a nurse assistant, as Plaintiff described, was at the heavy exertional level. Her job as a cashier at Kohl's department store was categorized as semiskilled and light. (Tr. 768-70)

The ALJ then posed a hypothetical question to the VE wherein the hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk for up to 6 hours with normal breaks; could sit for 6 hours with normal breaks; could not engage in climbing; and could do no more than occasional balancing and crawling. Based on this hypothetical, the VE opined that the individual could perform Plaintiff's past work as a cashier/checker. (Tr. 770)

In the second hypothetical, the ALJ asked the VE to assume the factors from the first hypothetical and add the limitations of understanding, remembering, and following simple instructions

and directions only in a routine work setting. The VE stated that the additional limitations would have no effect on the individual's ability to perform the job of cashier/checker. (Tr. 770-71)

Plaintiff's attorney also questioned the VE. The attorney first asked whether, in light of Plaintiff's past relevant work, there would be any skills acquired that were transferable to sedentary work. The VE answered that Plaintiff had no such acquired skills. The attorney then asked the VE to assume a hypothetical individual of the same age, education, and past relevant work experience as the Plaintiff, with the following limitations: inability to hear and understand simple, oral instructions or communicate simple information; and mild cognitive deficit due to TIA, preventing instruction comprehension. If the individual possessed these limitations, the VE stated that she could not perform any work existing in the national or local economies. (Tr. 771-72)

In a Disability Report – Adult, Plaintiff reported that she weighed 260 pounds and measured 5 feet 5 inches. She stated that her conditions cause problems standing for long periods of time, problems writing due to finger cramps, memory problems, and tumors on the back of her eyes that cause headaches. (Tr. 105-06)

### III.  Medical Evidence[1]

On December 30, 2005, Plaintiff presented to Christian Hospital Northeast complaining of

---

[1]  The undersigned notes that Plaintiff has chosen to place pertinent information regarding Plaintiff's medical history in lengthy footnotes, some spanning over half of the page. The 10-point single-spaced type face is not only difficult to follow, but much of the information is not tangential but necessary for the adjudication of Plaintiff's case. While the Eastern District of Missouri does not have a local rule addressing this issue, the Eighth Circuit Court of Appeals does require footnotes to be the same size text as that of the brief, and the undersigned suggests that Plaintiff's attorney follow this rule in future briefs, as well as place substantive material in the body of the brief. See, e.g., United States Court of Appeals for the Eighth Circuit Civil Case Briefing Checklist, http://www.ca8.uscourts.gov/newcoa/forms/cvbrchk.pdf

left-sided weakness, headache and slurred speech. (Tr. 223) She was admitted with questionable cerebrovascular accident. (Tr. 219) Several tests and a neurological consultation were performed which provided no positive revelation or significant findings. (Tr. 218) A CT of the head/brain without contrast was essentially unremarkable. (Tr. 237) An MRI of the brain without contrast did not show evidence of acute stroke but revealed evidence of empty sella. (Tr. 221, 235) Consulting physician Carlos M. Yu, M.D. noted an elevated sedimentation rate and recommended a connective tissue disease evaluation. (Tr. 222) Plaintiff was discharged on January 7, 2006 for outpatient physical therapy. (Tr. 218)

On November 1, 2006, Plaintiff presented to the emergency room for sharp pain in her right arm, pain in her wrist and hand, right arm weakness, and right shoulder pain. She was discharged to home the same day in stable condition, with a prescription for Lortab. (Tr. 267-81)

Dr. Heidi Miller treated Plaintiff between January 2006 and August 2008. (Tr. 134-43, 416-24, 444-60, 690-97) On February 6, 2006, Plaintiff presented for follow up on labs. She also complained of short term memory loss and slowed thinking. Dr. Miller noted the hospital neurology consult during her hospitalization for TIA, which found evidence for embellishment of symptoms. (Tr. 139) Plaintiff complained of numbness in her index finger and intermittent bilateral numbness in her arms while lying in bed on February 13, 2006. (Tr. 416) In a letter dated April 13, 2007, Dr. Miller noted that she was Plaintiff's primary care doctor and that Plaintiff suffered from mixed connective tissue disease ("MCTD") which affected her memory and cognition. (Tr. 129)

On May 14, 2007, Plaintiff returned to Dr. Miller for a follow up. She complained of fluid behind her eyes and a pressure feeling in her head. Plaintiff reported seeing an eye doctor and asked a lot of questions about headaches, neck pain, and head pain. (Tr. 422) On February 4, 2008,

Plaintiff reported having good days and bad days, with the bad days involving joint pain and requiring her to stay in bed 2 to 3 times a week. Dr. Miller assessed pseudotumor cerebri, tobacco use, asthma, high cholesterol, MCTD, positive lupus anticoagulant, and high blood pressure. (Tr. 458-60) On March 19, 2008, Dr. Miller noted normal neck, back, musculoskeletal system, and neurological exam. (Tr. 455) Plaintiff complained of right arm discomfort and right leg pain, mostly in her knee. On examination, Plaintiff had limited abduction, extension, and flexion in her right arm. Additionally, she had limited muscle strength of supraspinatus and with external rotation of the shoulder. Dr. Miller assessed right shoulder tendonitis and right knee pain, among other things. (Tr. 450-52)

On June 18, 2008, Plaintiff reported that a shoulder injection helped her. However, her back was bothering her, and her legs were cramping up. Dr. Miller assessed right shoulder tendonitis, right knee pain, and back and leg cramps. Dr. Miller prescribed Flexeril. (Tr. 447-49) Later that month, Plaintiff returned to Dr. Miller after being hospitalized for chest pain. Dr. Miller noted that the doctors ruled out myocardial infarction, and the stress echo was negative. Plaintiff reported that the muscle pull like sensation in her chest was gradually improving. In addition, Plaintiff complained of right groin pain, radiating down the anterior thigh to the knee, but no pain below the knee or lateral pain. Finally, Plaintiff reported back pain in the mid lower back which was not continuous. Dr. Miller assessed right knee pain, and back and leg cramps. (Tr. 444-46)

In treatment notes on August 1, 2008, Dr. Miller noted that Plaintiff had been denied disability three times and that she was on her fourth attempt to receive benefits. Plaintiff reported that she could stand 30 minutes before resting; sit 60 minutes, although sitting a lot hurt Plaintiff's lower back; and walk as far as one block, but would need to stop due to low back pain and discomfort down right leg. She could lift a gallon of milk only with her left hand, and she was right-handed. In addition,

Plaintiff could not do laundry or cook due to problems with standing. However, she was able to microwave prepared meals. Further, Plaintiff reported she could only walk with a cane. Plaintiff also mentioned great difficulty remembering things and following instructions. She stated that she did not cook because she would forget to turn off the oven and burn either her food or herself. Her only activity was watching TV, although her attention span lasted only 30 minutes, and she had trouble following movie plots. (Tr. 690)

Dr. Miller completed a Physical Medical Source Statement on September 10, 2008. Dr. Miller diagnosed generalized cognitive deficits due to neuropsychiatric complications of MCTD; right shoulder rotator cuff tendonitis; and low back pain. Dr. Miller opined that in an 8-hour workday, Plaintiff could sit for 1 hour, stand for 30 minutes, and walk for 15 minutes. She could only occasionally lift and carry 5 pounds but never lift and carry any greater weight. In addition, Plaintiff had significant manipulative limitation of the ability to handle and work with small objects with the right hand. She also was limited in her ability to understand simple oral instructions or communicate simple information. Dr. Miller noted that Plaintiff required a cane for walking. She could never reach over head or stoop, and she could tolerate only occasional exposure to odors, dust, and noise. Plaintiff's right rotator cuff tendonitis and lumbago caused frequent pain each day and all day. Objective indications of pain included reduced range of motion, motor disruption, and impaired gait. Subjective indications were complaints of pain and grimaces. In addition, Dr. Miller opined that Plaintiff needed to lie down, take a nap, or take more than 3 breaks during a normal workday. Dr. Miller listed Plaintiff's onset date as January 25, 2006, which was the first time Dr. Miller examined Plaintiff. (Tr. 686-89)

Zarmeena Ali, M.D., a rheumatologist with St. Louis ConnectCare, treated Plaintiff between

March 2006 and July 2008.  (Tr. 130-31, 300-82)  On March 8, 2006, Dr. Ali questioned whether Plaintiff had MCTD.  (Tr. 379-82)  Dr. Ali continued to treat Plaintiff for MCTD and complaints of pain and numbness during 2006.  (Tr. 351-68)

On April 3, 2007, Dr. Ali noted that she saw Plaintiff 4 months earlier for MCTD complicated by Raynauds, Sicca symptoms, and memory loss.  The purpose of Plaintiff's visit was to follow up with right hand, arm, and knee pain.  Plaintiff also complained of fatigue and bilateral pedal edema but noted no Raynauds symptoms since beginning medication.  (Tr. 346-49)  On April 20, 2012, Plaintiff reported continued pain in her right hand, which had improved, along with intermittent occipital headaches.  Dr. Ali assessed MCTD and ordered a brain MRI.  (Tr. 341-43)

On June 1, 2007, Plaintiff reported continued right hand swelling and pain, along with right knee pain and swelling.  She rated the intermittent pain as 8 out of 10.  In addition, Plaintiff complained of pain on the entire left side of her body.  Dr. Ali noted that Plaintiff was diagnosed with pseudotumor during an eye examination two months prior.  Dr. Ali planned to give Plaintiff a trial of low dose prednisone.  (Tr. 337-39)

When Plaintiff returned to Dr. Ali on September 25, 2007, Plaintiff denied having any pain. She did report dizziness everyday and headaches.  Dr. Ali suspected some tendinitis of the foot and recommended that Plaintiff lose weight.  Dr. Ali also changed Plaintiff's medications.  (Tr. 332-35) On October 23, 2007, Plaintiff complained of numbness in the lower extremities, possibly due to a new medication.  Dr. Ali advised her to discontinue the medication.  (Tr. 330)  When Plaintiff returned on November 6, 2007, she denied any pain but stated that she continued to have dizzy spells. Her musculoskeletal exam was unremarkable.  Dr. Ali noted that Plaintiff was doing well.  (Tr. 326-29)

On February 5, 2008, Plaintiff returned to Dr. Ali for complaints of right shoulder and right hand pain that began a month before. Upon examination, Plaintiff had decreased grip strength on the right side. In addition, she had limited shoulder abduction and painful internal and external rotation, along with AC tenderness. A shoulder x-ray was normal. Dr. Ali assessed MCTD and compression arthralgia of the shoulder region. Dr. Ali prescribed a trial of celebrex and recommended that Plaintiff do range of motion exercises for her shoulder, as well as reduce her weight. (Tr. 320-23)

Plaintiff reported pain all over on April 4, 2008. She also complained of right 2nd and 3rd digit pain and swelling for the past 2 months. She experienced no relief with celebrex. In addition, Plaintiff complained of pain in her legs bilaterally. Review of systems indicated pain in her right shoulder and numbness in her limbs. Although Plaintiff had no numbness of the right arm, she did have reduced hand grip. She also mentioned a fear of picking things up. Plaintiff's range of motion in her lower and upper extremities was normal bilaterally, with no muscle tenderness. However, she displayed abnormal deep tendon reflexes. Dr. Ali assessed MCTD and rotator cuff tendonitis. Plaintiff was reluctant to try an injection, so Dr. Ali adjusted her medications. Dr. Ali also advised Plaintiff to lose weight and exercise. (Tr. 314-17)

On April 15, 2008, Plaintiff reported increased sedation, nausea, and vomiting with ultram and discontinued the medication. Plaintiff resumed celebrex and soma and reported having relief. (Tr. 311) When Plaintiff returned to Dr. Ali on May 22, 2012, she complained of pain all over her right arm and swelling in her ankles. In addition, she continued to complain of right shoulder pain, right hand pain, and bilateral lower extremity pain. Dr. Ali noted pain elicited during a Neer impingement test and on passive abduction of the right shoulder, along with biceps tendon insertion pain. Dr. Ali assessed MCTD and bicipital tendonitis. Dr. Ali performed a corticosteroid injection

of the right biceps tendon.  Plaintiff tolerated the procedure well and experienced improved range of motion in her right shoulder.  (Tr. 307-10)

On July 17, 2008, Plaintiff returned to Dr. Ali for a follow-up regarding her right shoulder pain.  She also complained of a swollen right toe.  Plaintiff reported improved pain control in her right shoulder since the injection.  Dr. Ali assessed cellulitis and MCTD.  An x-ray of the right foot showed no fracture but some soft tissue swelling.  Dr. Ali prescribed augmentin for possible cellulitis.  (Tr. 300-04)

Also in July 2008, Dr. Ali completed a Physical Medical Source Statement, indicating that Plaintiff's diagnoses included undifferentiated connective tissue disease complicated with TIA; Raynaud's disease with arthralgias, hair loss, Sicca symptoms; and pseudotumor.  Dr. Ali opined that in an 8-hour workday, Plaintiff could sit for 4 hours, stand for 2 hours, and walk for 1 hour.  In addition, she could occasionally lift and carry 5 to 10 pounds but never lift or carry any greater weight.  Plaintiff had no significant manipulative limitation of the ability to handle and work with small objects with either hand.  However, she did have a limitation preventing her ability to hear and understand simple oral instructions or communicate simple information due to the TIA.  Plaintiff was not limited in balancing and could occasionally reach above her head and stoop.  In addition, she could occasionally tolerate exposure to dust, odors, or noise.  Plaintiff's daily right arm and shoulder pain lasted all day.  Objective indications of pain resulted in muscle spasm, reduced range of motion, and sensory disruption.  Plaintiff's subjective indications included complaints of pain and grimaces. Plaintiff did not need a cane or assistive device, nor did her impairments require her to lie down or take a nap during a normal workday.  Dr. Ali listed the date of onset as December 30, 2005.  Further, Dr. Ali noted that Plaintiff had some cognitive deficits and memory impairments and may benefit from

neuropsychological testing. (Tr. 511-14)

Dr. Ali completed a second Physical Medical Source Statement on August 20, 2009, assessing undifferentiated connective tissue disease and morbid obesity. Dr. Ali opined that in an 8-hour workday, Plaintiff could sit for 2 hours, stand for 1 hour, and walk for 1 hour. She could only occasionally lift and carry no more than 5 pounds. She had manipulative limitations in the right hand stemming from chronic right shoulder pain. Dr. Ali noted that Plaintiff intermittently needed a cane for balance due to buckling of the knees. Plaintiff's impairment that produced pain was indicated by muscle spasm, reduced range of motion, and sensory disruption. Subjectively, Plaintiff complained of pain and displayed irritability and grimaces. In addition, Dr. Ali opined that Plaintiff's pain precluded persisting or focusing on simple tasks on a sustained full-time work schedule. Plaintiff would need to miss work, be late, or need to leave work early 3 or more times a month due to her impairments. Plaintiff would not need to take naps during the workday, but she would need to take more than 3 breaks. Dr. Ali further opined that Plaintiff needed to change positions at will due to shoulder, back, and knee pain. Dr. Ali indicated that she advised Plaintiff to lose weight and exercise to help with back and knee pain. Dr. Ali also stated that Plaintiff's memory impairment from past TIA would limit her ability to work. (Tr. 743-46)

Plaintiff's medical history also includes examinations by other physicians. On January 17, 2008, Dr. Laurain Hendricks examined Plaintiff for complaints of shoulder pain. Plaintiff reported sustaining a stroke 2 years prior which resulted in right sided weakness. Dr. Hendricks noted tenderness on palpation of the acromioclavicular joint and subacromial bursa, as well as abnormal shoulder rotation and flexion. Dr. Hendricks assessed right shoulder pain and recommended that Plaintiff alternate between warm and cold compresses and start range of motion exercises for her right

shoulder.  (Tr. 461-63)

On January 21, 2008, Dr. Elbert H. Cason performed a consultative examination.  Plaintiff complained of a stroke in 2005 on the right side of her body; lupus which caused pain in all joints; a tumor in the back of one eye; high blood pressure; high cholesterol; and asthma.  She reported extreme weakness in the right upper and lower extremities with very limited use of the right side of her body.  She walked with a cane, reportedly prescribed by a doctor, which she held in her left hand.  Plaintiff further reported an ability to walk only 25 feet, stand for only 5 minutes, and walk up 2 steps.  She could not squat or bend over.  Plaintiff did not know which eye had the tumor, and testing in each eye was 20/20 uncorrected.  Plaintiff's blood pressure was good, and her high cholesterol was controlled with medication.  Plaintiff stated that she lived with her two sons who did all the chores.  She got out of the house once a month and sometimes slept 5 hours during the day.  (Tr. 169-70)

On examination, Dr. Cason noted that Plaintiff was morbidly obese and could not get up on the exam table.  Plaintiff had decreased back motion with paravertebral lumbar area tenderness but no muscle spasms.  Straight leg raises while seated were 45 degrees right and left.  Plaintiff was unable to heel or toe stand or squat.  Plaintiff's gait with the cane was slow and shuffling.  Cervical spine motions , knee motions, and elbow motions on the right were greatly decreased but normal on the left.  Plaintiff had no motion in her right ankle, right wrist, and right shoulder.  Major muscle group strengths of the lower extremities were 2/5 on the right and 5/5 on the left.  Similarly, major muscle group strengths of the upper extremities were 1/5 on the right and 5/5 on the left.  Grip strengths were absent on the right, but he left was normal.  Dr. Cason found no evidence of any joint pain, swelling, or inflammation.  In addition, he found no evidence of instability, contracture, or ankylosis of any joint other than generalized weakness of the right side in the upper and lower

extremities. Dr. Cason noted neurological abnormality on the right side of Plaintiff's body, resulting in marked weakness in the upper and lower extremities following a stroke. The findings of paralysis on the right side were permanent. (Tr. 170-72)

On July 8, 2008, Dr. Robert Brophy, an orthopedist, examined Plaintiff for complaints of left and right knee pain. An x-ray of the right knee showed normal and symmetric joint spaces with no fracture, bone abnormality, or effusion. (Tr. 442, 591)

L. Lynn Mades, Ph.D., performed a psychological evaluation of Plaintiff on October 17, 2008. Dr. Mades noted that Plaintiff was casually dressed and well-groomed. She was overweight and ambulated with a cane. During the examination, Plaintiff was spontaneous, coherent, relevant, and logical, with no problems in receptive or expressive language ability. Her mood was mildly depressed, and her affect was slightly restricted, tearful at times, and generally appropriate. Dr. Mades noted no evidence of thought disturbance; however, her insight and judgment were slightly limited. With regard to Plaintiff's personality assessment, Dr. Mades found that Plaintiff produced an invalid profile in the MMPI-2 test, which showed likely exaggeration of psychological difficulties. Plaintiff reported that she did not perform household chores or drive. However, she occasionally went out with a family member, and she watched television. Plaintiff reported getting along adequately with others and an ability to take care of most of her personal needs. In addition, during the exam Plaintiff demonstrated the ability to maintain adequate attention and concentration, with appropriate persistence and slightly decreased pace. Dr. Mades diagnosed adjustment disorder with depressed mood and a GAF of 75-80. Plaintiff's prognosis was fair to good with appropriate intervention. (Tr. 698-702)

Dr. Mades also completed Medical Source Statement of Ability to do Work-Related Activities

(Mental). Dr. Mades opined that Plaintiff's impairment did not affect her ability to understand, remember, and carry out instructions. Her ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in the routine setting, were only mildly affected by her impairment. Dr. Mades explained that Plaintiff may have mild problems due to depression. (Tr. 703-05)

On April 4, 2008, Donna Muckerman-McCall, D.O., completed a Physical Residual Functional Capacity Assessment. The consultant opined that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. She could stand, walk, and sit for about 6 hours in an 8-hour workday, and push/pull on an unlimited basis. Plaintiff could never climb ladders, ropes, or scaffolds; occasionally balance and crawl; and frequently climb ramps and stairs, stoop, kneel, and crouch. She had no manipulative, visual, or environmental limitations. Her opinion also indicated that she needed more information to provide a complete assessment. (Tr. 176-82)

## IV.  The ALJ's Determination

In a decision dated February 24, 2009, the ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. She had not engaged in substantial gainful activity since December 30, 2006, her alleged onset date. Further, the ALJ determined that Plaintiff's severe impairments included high blood pressure, elevated cholesterol, possible previous stroke, systemic lupus erythematosus, and asthma. The ALJ found, however, that objective medical evidence did not support Plaintiff's allegations of the additional severe impairments of headaches, cramping in fingers, and tumor in her eye. Further, Plaintiff's alleged mental impairments were non-severe. (Tr. 12-13)

The ALJ determined that Plaintiff did not have an impairment or combination of impairments

that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. After careful consideration of the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to lift 20 pounds occasionally, frequently lift 10 pounds, stand or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, occasionally balance or crawl, and never climb. In addition, Plaintiff was limited to simple, routine work that required no more than simple one or two step instructions. The ALJ assessed Plaintiff's medical records and her testimony. The ALJ noted that Dr. Ali's treatment notes did not support the limitations expressed in the medical source statement. Because Dr. Ali provided very little explanation for and objective testing to support the limitations, the ALJ gave the opinion little weight, finding instead that the opinions were based on Plaintiff's description of her symptoms. Further, with regard to Dr. Miller's medical source statement, the ALJ found that the lack of regular treatment by Dr. Miller undermined the persuasiveness of the opinion. The ALJ also noted the record contained no evidence that Plaintiff's morbid obesity was accompanied by significant degenerative joint or disc disease or has caused any other illnesses or impairments. With regard to Plaintiff's cane, the ALJ noted that Plaintiff did not require the cane, as was evidenced by an investigation by the Office of the Inspector General. According to the ALJ, a video showed that Plaintiff did not need a cane for standing or ambulation. (Tr. 13-19)

Therefore, the ALJ determined that Plaintiff was able to perform her past relevant work as a checker or cashier as generally performed despite the RFC findings by the ALJ. Alternatively, the ALJ found that Plaintiff was unable to perform her past relevant work but was able to perform jobs existing in significant numbers in the national economy. Based on her younger age, limited 11th grade education, work experience, and RFC, the ALJ determined that Plaintiff could work as a

16

cashier/checker or could adjust to perform sedentary work under Medical-Vocational Rule 201.25. The ALJ thus concluded that Plaintiff had not been under a disability at any time from December 30, 2006 through the date of the decision.  (Tr. 20-21)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work.  Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence.  42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the

evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler,

complaints that the ALJ could discount his testimony as not credible. <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## VI. Discussion

The Plaintiff raises several arguments in her Brief in Support of the Complaint. First, Plaintiff asserts that the ALJ erred by finding at step four that Plaintiff could perform her past relevant work as a cashier or checker. Next, Plaintiff contends that the ALJ's alternative conclusions at step five are not permissible under the sequential evaluation process. Plaintiff also argues that the ALJ erred by rejecting the opinions of Plaintiff's treating physicians with an insufficient analysis and failing to evaluate the state agency medical opinion. Finally, Plaintiff asserts that the ALJ's RFC finding is not supported by substantial evidence, and the ALJ failed to support the determination with a narrative discussion. Defendant, on the other hand, maintains that the ALJ properly evaluated the medical opinion evidence and properly assessed Plaintiff's RFC.

The undersigned finds that the ALJ erred in his RFC assessment and that the case should be remanded for further review. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). " Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's

739 F.2d 1320, 1322 (8th Cir. 1984).

abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." <u>SSR 96-8p</u>, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). This evidence includes descriptions and observations of the claimant's limitations from the alleged impairment(s) and symptoms provided by the claimant and by family, neighbors, friends, or other persons. 20 C.F.R. § 416.945(a)(3).

"An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" <u>Sieveking v. Astrue</u>, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." <u>Tinervia v. Astrue</u>, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); <u>see also</u> <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' . . . .").

The Plaintiff argues that the ALJ failed to provide any explanation for his RFC conclusion and erroneously relied on a non-examining consultant. The undersigned agrees. The decision contains no discussion demonstrating that Plaintiff has the ability to work in an ordinary work setting on a

regular and continuing basis, despite her limitations.

More importantly, the ALJ did not provide an explanation regarding which medical evidence supported the RFC determination. Although the ALJ did assess the medical evidence, the ALJ's determination takes five pages to explain why the opinions of Plaintiff's treating physicians and the opinions of the examining consulting physician are not credible. Indeed, the ALJ's determination is void of any evidence supporting the opinion that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, as well as stand, walk, or sit for 6 hours in an 8-hour workday. Plaintiff correctly notes that the ALJ appears to have relied on the non-examining, consulting physician instead of the opinions of her treating physicians, one being a rheumatologist with St. Louis ConnectCare.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). However, "an ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Holstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (citation omitted). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted). In the instant case, Drs. Miller and Ali were Plaintiff's treating physicians, and the record demonstrates that Dr. Ali, a rhuematologist, treated Plaintiff for connective tissue disease on a regular basis for over two years. (Tr. 130-31, 300-82) Despite the opinions from Plaintiff's treating physicians, however, the ALJ adopted the RFC of Donna Muckerman-McCall,

D.O., who never examined Plaintiff and noted that, "after reviewing the evidence, I have found inconsistencies that lead me to conclude that assessment is not possible w/o further information." (Tr. 178)

"It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 (8th Cir. 2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." <u>Shontos v. Barnhart</u>, 328 F.3d 418, 427 (8th Cir.2002). The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3). Here, The RFC assessment appears to reflect Dr. Muckerman-McCall's conclusions. However, the ALJ failed to explain how these opinions are superior to that of the treating doctor, especially in light of the consultant's notation that she needed further information.

The undersigned therefore finds that this case should be remanded to the ALJ for further review. On remand, the ALJ should further assess the opinions of Plaintiff's treating physicians. In this regard, the ALJ may wish to re-contact Drs. Miller and Ali for clarification or additional information. The ALJ should also evaluate Dr. Ali's most recent medical source statement. (Tr. 743-46). To the extent that the ALJ relies upon the non-examining consultative evaluation, the ALJ should explain his reasoning for giving that opinion greater weight. Further, the ALJ should support his assessment of Plaintiff's RFC with references to specific medical and non-medical evidence in the record. Finally, if the ALJ modifies Plaintiff's RFC, he should submit a new hypothetical question

to a VE in determining whether Plaintiff is capable of performing her past work or other work in the national economy.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of July, 2012.